Argued February 23, reversed May 14, reconsideration
denied June 19, petition for review denied July 5, 1979
287 Or 45

WHITE, et ux, *Respondents,*
*v.*
OREGON HORTICULTURAL SUPPLY, INC.,
*Appellant,*
*and*
OREGON HORTICULTURAL SUPPLY,
*Cross-Claimant,*
*v.*
PLANT PRODUCTS CORP., *Cross-Defendant.*
(No. 417-776, CA 10388)
594 P2d 1321

John A. Schiewe, Portland, argued the cause and filed the brief for appellant.

Alonzo P. Stiner, Portland, argued the cause for respondents. With him on the brief was Lovett & Stiner, P. C., Portland.

Before Schwab, Chief Judge, and Thornton, Lee and Gillette, Judges.

GILLETTE, J.

## GILLETTE, J.

This is an action by the owners of a hydroponic tomato-growing business against the retail suppliers of a fumigant called VAPONA for an alleged breach of implied warranty of merchantability and implied warranty of fitness for a particular purpose.

At trial defendant moved for a directed verdict on the issue of damages, arguing that there was insufficient evidence to justify submitting plaintiff's claim for lost profits to the jury. The trial court denied the motion. Instead, upon plaintiff's motion, the trial judge directed a verdict in favor of plaintiffs on the issue of liability and submitted to the jury the issue of damages. The jury returned a verdict for plaintiffs in the amount of $13,952. Defendant assigns the denial of its motion as error. We agree with defendant that the trial court erred in submitting the issue of lost profits to the jury and therefore reverse. Because of our disposition of the issue of damages, we do not reach the three additional assignments of error made by defendant.

In early 1974, Mr. and Mrs. White (plaintiffs) decided to enter the hydroponic tomato-growing business. They planted their first crop of tomatoes in July 1974, and harvested their first tomatoes on October 15, 1974. On November 12, 1974, upon advice by defendants, plaintiffs used a fumigant called VAPONA in an attempt to control a white fly infestation problem. The leaves of the tomato plants were badly burned—allegedly as a result of the use of VAPONA. Plaintiffs attempted to salvage the plants by the addition of nutrients and fertilizer, but tomato production dropped and the tomatoes that were subsequently produced by the plants were of poor quality and misshapen. Plaintiffs continued, however, to harvest and sell tomatoes until August, 1975, when they 'pulled' the plants. They planted their second crop nine months later in April, 1976. Plaintiffs harvested their first tomatoes from the 1976 crop in June; full produc-

tion was reached in July and August. In September, 1976, plaintiff's sold their greenhouse.

■ Plaintiffs are seeking reimbursement for the amount of profits they lost on the 1974-75 crop of tomatoes due to the damage allegedly caused by VAPONA. Plaintiffs argued they could have expected the tomato plants to produce 5,000 pounds of tomatoes per month over the 10 month period from November, 1974 to August, 1975 (which is the production life of hydroponic tomato plants). Plaintiffs estimated the market price for that time period to be 41 cents per pound, which would amount to gross income of $20,500, and, after expenses, net profits of approximately $15,000. The issue raised on this appeal is whether plaintiff's offered sufficient evidence to support their estimate of a 5,000 lbs. per month production rate and a 41 cents per lb. market price.

Plaintiffs did not establish with any degree of certainty the amount of tomatoes they were capable of harvesting per month over a 10 month span of time. Their records indicated only the amount of tomatoes sold for the period from October 15 to November 19, 1974. After that date, the receipts of sale placed in evidence by plaintiffs do not consistently indicate the price paid per pound of tomatoes, but instead state the price paid per box. Because the box size varies, the amount of tomatoes sold cannot be ascertained. Nor was there any testimony by other growers or experts in the field as to what sort of production might be expected with plaintiff's operation. Plaintiff's estimate of production at 5,000 lbs. per month is supported only by plaintiff's records for 2 months of production in 1976 - a year later. Plaintiff's planted their second crop in April, 1976, harvested their first tomatoes in June and reached full production in July and August of 1976. Plaintiff's records indicate that plaintiff's sold 10,000 lbs. of tomatoes during July and August. This is not a reliable figure from which to establish an average 10 months production rate for the period in 1975, however, because there was undisputed testi-

[326]

mony that July and August are peak production months owing to longer daylight hours.

Neither did plaintiffs present adequate data to permit the jury to establish the average market price of tomatoes during the period in question. Mrs. White testified that the market price generally for the months of November and December is 50 cents per pound and that it is less in the late summer months. She also testified that the market price for October, 1974 was 40 cents per pound. The records offered by plaintiffs, however, did not support that estimate, but rather indicate that market price from October 15 through November 12, 1974, averaged 32 cents per pound. The records did not indicate market price for the period from January through August, 1975. Mr. White testified that market price for July and August of *1976* was 42 cents per pound, which was substantiated by the records offered by plaintiffs, but this was insufficient to show what the average price was in 1975. The jury was left to speculate concerning the 1975 growing period. Defendant's motion should have been granted.

In *KWIPCO Inc. v. General Trailer Co.*, 267 Or 184, 188, 515 P2d 1317 (1973), the Supreme Court outlined the test for evidence needed to support a claim for lost profits:

> "* * *[D]amages are recovered for loss of future profits only to the extent that the evidence affords a sufficient basis for estimating the amount of such profits with reasonable certainty. [citation omitted] As stated more recently, * * * the essential ingredient of proof of lost profits to a reasonable certainty is supporting data. [citations omitted]."

■ Satisfying the test of reasonable certainty required for proof of lost profits is particularly difficult where the business is short-lived. As stated in *Buck v. Mueller:*

> "* * *[T]he loss of profits must not be uncertain and speculative. [citations omitted] * * * * Past profits may be shown if they reflect the operation of an

[327]

established business. [citations omitted]. If the business has not operated long enough to establish a reliable record of profits, the jury will not be permitted to speculate upon the probable success of the particular business alleged to have been harmed." *Buck v. Mueller*, 221 Or 271, 283, 351, P2d 61, 67 (1960).

At the time the VAPONA was sprayed, plaintiffs had experienced approximately one month of tomato production. As of that time, the business had not operated at a profit.[1]

Plaintiff's records indicate a gross income of $3,532.23 for the operating period from October 15, 1974, through August, 1975—$2,210 of which was received from October 15 to December 1974. Plaintiffs produced receipts for expenses for the full operating year of 1974-75 which totalled $11,750, which when combined with the value of their own services averages to an estimated figure of $1,200 per month for expenses.

■ We think plaintiff's evidence falls short of the requirements outlined in *KWIPCO, supra* and *Buck v. Mueller:* there is not a "reliable record of profit" nor is there sufficient supporting data to establish with reasonable certainty the amount of profits plaintiffs could have expected to make during the 10 month period from November, 1974 through August, 1975. Plaintiffs did not establish with reasonable certainty what their average production could have been expected to be during any comparable period to that for which damages are claimed. Nor did they establish by use of any supporting data what the market price for tomatoes was during the period from November 15, 1974 to August, 1975. The only time period for which plaintiffs were able to show a profit was the two month period in July and August, 1976—admittedly, two of the better months in the growing season. Such a

---

[1] Plaintiff's records indicate gross income of $1,115.70 for the period from October 15 to November 12, 1974. Their own estimate of expenses, supported by their record of receipts and combined with an estimated value of their own services was $1,200 per month.

showing cannot serve as an appropriate measure for profits over a 10 month growing season when there has not been adequate supporting data presented to establish production rate and market price for the winter and spring months.

In summary, we hold that there was insufficient evidence to submit to the jury the question of whether plaintiffs were entitled to recover for lost profits. The trial court erred in denying defendant's motion for directed verdict on the issue of damages.[2]

Reversed.

---

[2] In spite of the fact that most of the argument on the issue of damages was directed at the loss of profits theory, the trial judge had instructed the jury on an additional theory of damages - the "growing crops" theory. The judge indicated that damages under the growing crops theory called for the difference between the fair market value of the crop before the burn and the fair market value of the crop immediately after the burn:

"This is to be asserted [sic] by taking the market value at the maturity of which the crop would have had but for the damage to the tomatoes and deducting the value which the damaged crop actually had at maturity. * * *."

Plaintiffs have not argued this theory on appeal. In this value judgment, plaintiffs appear correct: There was no evidence other than the evidence relating to the loss of profits theory, and certainly none to sustain a claim on the "growing crops" approach.